# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re: VAUGHAN COMPANY, REALTORS,                              No. 11-10-10759

      Debtor.

---

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on the Motion to Convert Case to a Chapter 7 ("Motion to Convert") filed by Julius Wollen, as Trustee of the Julius M. and Diane Wollen Revocable Trust, dated October 20, 1993 ("Wollen"). *See* Docket No. 1018. Judith Wagner, Chapter 11 Trustee of the bankruptcy estate of the Vaughan Company Realtors (Ms. Wagner, or the "Trustee") and the United States Trustee ("UST") filed a response and supplemental response in opposition to the Motion to Convert.[1] *See* Docket Nos. 1073, 1074, 1132, and 1166. Wollen seeks to convert the Debtor's Chapter 11 case to a case under Chapter 7 for cause in accordance with 11 U.S.C. § 1112(b)(1). Wollen contends that "cause" exists to convert this Chapter 11 case based on a substantial or continuing loss or diminution of the estate, the Trustee's failure to comply with the requirements of 11 U.S.C. § 1106(a), the Trustee's failure to file a plan and disclosure statement, and the absence of a reasonable prospect for confirmation of a Chapter 11 plan. The Court commenced a final, evidentiary hearing on the Motion to Convert on February 25, 2013. Wollen, the Trustee, and the UST each submitted written closing argument on April

---

[1]The Official Committee of Note Holders (the "Committee") joined in the UST's response to the Motion to Convert. *See* Docket No. 1075. At the final hearing, an issue arose as to whether counsel for the Committee had been authorized by the Committee to join in the UST's response and oppose the Motion to Convert. The Court gave counsel for the Committee an opportunity to submit documentation reflecting the Committee's authorization to oppose the Motion to Convert. On April 15, 2013, counsel for the Committee filed an affidavit in support of the Committee having granted such authority. *See* Docket No. 1313. The Court need not decide whether the Committee opposes the Motion to Convert because that decision would not change the Court's ruling with respect to the Motion to Convert.

12, 2013.  *See* Docket Nos. 1303, 1304, and 1305.   The Court then took the matter under advisement.

After consideration of the Motion to Dismiss, the responses thereto, the evidence presented at the final hearing, and the written closing arguments, and being otherwise sufficiently informed, the Court finds that cause does not exist under 11 U.S.C. § 1112(b)(1) to convert the Chapter 11 case to Chapter 7.  The Motion to Convert will therefore be denied.

## FINDINGS OF FACT

The Vaughan Company Realtors ("VCR" or "Debtor") was a real estate brokerage company operating in New Mexico.  The Trustee claims that VCR's principal, Douglas Vaughan, caused VCR to operate a Ponzi scheme.  VCR issued promissory notes to hundreds of different investors; many of the notes were secured by the same real property.  After VCR commenced this bankruptcy case, Douglas Vaughan went to prison and the Securities Exchange Commission ("SEC") filed an action against VCR.

On February 22, 2010, VCR filed a voluntary petition under Chapter 11 of the Bankruptcy Code, thereby commencing its bankruptcy case.  The Schedules filed in VCR's bankruptcy case reflected assets totaling $643,363.18, including accounts receivable in the amount of $539,179.43.  *See* Docket No. 82.   Roughly two months later, the UST asked the Court to approve the appointment of a Chapter 11 Trustee of the VCR bankruptcy estate.  *See* Docket No. 163.  The Honorable James Starzynski appointed Judith A. Wagner as the Chapter 11 Trustee of the VCR estate on April 29, 2010.[2]  *See* Docket No. 201.  Ms. Wagner is a certified public accountant specializing in forensic accounting.  Ms. Wagner has previously served as a

---

[2]Judge Starzynski presided over the VCR bankruptcy case until June 28, 2012, when the case was transferred to the Honorable Robert H. Jacobvitz.

receiver and an arbitrator for the American Arbitration Association. Ms. Wagner employed

Arland & Associates, LLC on May 4, 2010 as her counsel.[3]

When Ms. Wagner was appointed Chapter 11 Trustee, VCR was operating as a real estate

company. After consulting with the VCR management team, Ms. Wagner determined that VCR

had a number of pending real estate transactions and outstanding commissions. Ms. Wagner

employed a qualifying broker to close real estate contracts entered into prior to her appointment

and to collect commissions due to VCR. Ms. Wagner collected over $300,000 from those

contracts. Except for closing pending real estate transactions, Ms. Wagner did not operate VCR

as an ongoing business. She has no intention of resuming the business operations of VCR.

On June 25, 2010, Ms. Wagner filed a motion to convert the bankruptcy case from

Chapter 11 to Chapter 7 ("VCR's Motion to Convert"). *See* Docket No. 269. At the time, Ms.

Wagner believed the bankruptcy estate would incur less administrative expense if the case

converted from Chapter 11 to Chapter 7. Ms. Wagner was also unsure whether, and to what

extent, VCR would be able to fund a Chapter 11 plan. The Committee filed an objection to

VCR's Motion to Convert, contending that the monthly operating reports (individually "MOR")

Ms. Wagner would be required to file under Chapter 11 of the Bankruptcy Code would benefit

the creditor body. The Securities Exchange Commission ("SEC"), with whom Ms. Wagner was

negotiating a settlement, also wanted Ms. Wagner as Chapter 11 Trustee to continue to provide

MORs for VCR.

After filing VCR's Motion to Convert, Ms. Wagner compared the administrative costs

associated with a Chapter 11 case, which include quarterly fees paid to the UST and the cost of

---

[3] Beginning in January, 2013, Ms. Wagner employed Askew & Mazel, LLC (James Askew and Edward Mazel) as her counsel. *See* Order Granting Chapter 11 Trustee's Application to Employ Askew & Mazel, LLC (Docket No. 1256). James Askew and Edward Mazel previously worked for Arland & Associates, LLC and performed most of the services for the Trustee rendered by that firm. *See* Docket Nos. 1126 and 682. Arland & Associates, LLC withdrew as counsel of record for the Trustee in this bankruptcy case. *See* Docket No. 1286.

preparing the MORs, with the administrative costs associated with a Chapter 7 case, which include bank charges for use of specialized Chapter 7 trustee software. During her discussions with the SEC, she also determined that she needed to explore different avenues of recovery, including collecting money from VCR's insurance policy. Ms. Wagner believed it would be easier to pay VCR's insurance premiums in the Chapter 11 case. Because Ms. Wagner was successful at collecting commissions from outstanding real estate contracts during the summer and fall of 2010, she also determined that it may be possible to fund a Chapter 11 plan. On September 17, 2010, Ms. Wagner withdrew VCR's Motion to Convert.

Shortly after her appointment as Trustee, Ms. Wagner took possession of VCR's computers and files in an attempt to reconstruct VCR's records. The task of reconstructing VCR's records was particularly arduous because Douglas Vaughan maintained separate, "off book" ledgers documenting the transactions made in furtherance of the alleged Ponzi scheme. The Federal Bureau of Investigation ("FBI") seized VCR's records, digitized the records, and provided Ms. Wagner with some of the records in the fall of 2010. Reconstruction of the records required specific forensic expertise.

Ms. Wagner filed VCR's outstanding tax returns. She performed a detailed accounting to determine how much money each individual investor in VCR's promissory note program received from VCR in connection with the alleged Ponzi scheme. Between June, 2011 and February, 2012, Ms. Wagner started pursuing fraudulent and preferential transfer actions against investors in VCR's promissory note program who received some or all of the return on their investment.[4] Ms. Wagner made the decision to pursue these fraudulent and preferential transfer

_____

[4]In this Memorandum Opinion, the phrase "fraudulent and preferential transfer actions" refers to the avoidance actions filed by the Trustee against investors in VCR's promissory note program. The phrase "avoidance actions" includes the fraudulent and preferential transfer actions and any other avoidance actions brought by the Trustee.

-4-

actions in consultation with her counsel and with the UST.  Ms. Wagner filed suit against over

one hundred fifty investors, seeking to avoid roughly $37 million in allegedly fraudulent

transfers or preferential transfers and recover those funds for the bankruptcy estate.

In connection with her administration of the Debtor's Chapter 11 estate the Trustee has

employed the following professionals for the following purposes:   1) Askew & Mazel, LLC and

Arland & Associates, LLC (general counsel for the Trustee)(Docket Nos. 273 and 1256);[5]

Wagner Valuation & Financial Forensics, LLC ("Wagner Forensics")(accountants for the

Trustee)(Docket No.  263); Sanders & Westbrook, P.C. (special counsel for the Trustee)(Docket

Nos. 392 and 348);  Linda Bloom (expert witness for the Trustee)(Docket No.  460); Broderick,

Phillippi, Wright and Comunas, LLC ("Broderick Firm")(accountants for the Trustee)(Docket

No.  393); Perfectly Legal, Inc. (document production services)(Docket No. 1215);  Rocky

Mountain Advisory (consultant and/or expert witness in connection with adversary proceedings

and contested matters)(Docket No. 1261);  Robert A. Johnson, Diane Webb, Nancy S. Cusack,

and Andrew J. Cloutier (mediators for pending fraudulent and preferential transfer

actions)(Docket No. 619); Pension Planning Consultants, Inc. (administer and/or wind up the

Debtor's 401(k) profit sharing plan)(Docket No. 325);  John N. Liewen & Associates, P.A.

(special counsel for the Trustee – tax advice, preparation of estate tax returns) (Docket No. 316);

and Bentley & Associates, LLC (auctioneer)(Docket No. 272).   So far, the Court has approved

the total amount of $1,350,000 for compensation of the various professionals employed by the

Trustee as administrative expenses of the bankruptcy estate.[6]   The fee applications filed by

---

[5]Arland & Associates, LLC withdrew its representation of the Trustee.  *See* Docket No.  1286.  Askew & Mazel, LLC replaced Arland & Associates, LLC as general counsel for the Trustee.    James Askew and Edward Mazel worked for Arland and Associates, LLC prior to their formation of Askew & Mazel.

[6] The following chart details the allowed compensation amounts for professionals employed by the Trustee and the allowed compensation for counsel for the unsecured creditors committee:

bankruptcy counsel for the Trustee break down the fees it charged into several categories, including "Case Administration," "Clawbacks," "Preferences," and other case-specific categories, such as "Litigation – Wollen" and "Litigation – Etkind." *See* Docket Nos. 635-3 and 1083-3. Through April of 2012, fees under the "Clawback" category totaled $195,000.00. *See* Docket No. 1083-3. Fees for general "Case Administration" totaled over $150,000.00. Services performed by Wagner Forensics and the Broderick Firm included general accounting and tax work in addition to service relating to VCR's promissory note program. *See* Docket Nos. 1116 and 1087. The aggregate litigation costs for the case-specific categories totaled over $166,000.00 as of April 2012. *Id.* The Trustee has also been paid commissions based on disbursements of estate funds.[7]

Counsel for Ms. Wagner estimated that, as of November 2012, the total remaining litigation budget would be roughly $600,000.00.[8] As of February 25, 2013, Ms. Wagner spent

| Professional | Compensation Amount | Period | Docket No. |
|---|---|---|---|
| Arland & Associates, LLC | $542,092.57 | June 1, 2011 through April 30, 2012 | 1126 |
| Arland & Associates, LLC | $379,235.71 | May 4, 2010 through May 31, 2011 | 682 |
| Broderick, Phillippi, Wright & Comunas, LLC* | $111,968.55 | September 1, 2011 through February 29, 2012 | 1186 |
| Broderick, Phillippi, Wright & Comunas, LLC | $87,331.70 | September 1, 2010 through August 31, 2011 | 1185 |
| Wagner Valuation & Financial Forensics, LLC | $171,081.39 | May 4, 2010 through December 31, 2011 | 1125 |
| Sanders & Westbrook, P.C.** | $54,227.67 | October 7, 2010 through December 31, 2011 | 1203 |
| Pension Planning Consultants, Inc. | $3,995.38 | July 12, 2010 through May 31, 2011 (First and Final Application) | 574 |
| **TOTAL:** | **$1,349,932.97** | | |

*Broderick, Phillippi, Wright & Comunas, LLC was substituted for Phillippi, Wright & Co. *See* Docket No. 608.
**On April 23, 2013, Sanders & Westbrook, P.C. filed a Second Interim Fee Application for the period beginning January 1, 2012 through February 28, 2013 seeking approval of fees, costs, and expenses in the total amount of $90,660.92. *See* Docket No. 1322. No order approving the Second Interim Fee Application of Sanders & Westbrook, P.C. has been entered.
[7]*See* Order Granting Chapter 11 Trustee's Amended First Application for Allowance of Commissions Earned and Costs Incurred Through December 31, 2011 and for Authority to Pay all Allowed Commissions and Costs (Docket 1143) approving commissions in the amount of $58,819.85. A second application seeking approval of commissions in the amount of $53,119.11 remains pending. *See* Docket No. 1328.
[8]From the evidence, it is unclear whether this estimate was for legal fees only or for all professional fees.

roughly $2.16 million on the administration of VCR's estate, including legal and other professional fees and costs associated with investigating fraud claims, reviewing claims, performing detailed accountings, examining tax matters, and performing other tasks. Most of the accounting work and investigation costs associated with tracing funds from VCR to the investors in VCR's promissory note program has been completed. Ms. Wagner began mediating with a substantial number of VCR investors and insiders in late 2012 and early 2013. It is unclear from the evidence before the Court how much money VCR's estate spent in an attempt to settle the claims.

In September 2010, before Ms. Wagner began settling claims with insiders and investors, VCR had $174,614.53 in liquid assets. As of February 28, 2013, the estate had collected a total of over $3.7 million, and expended approximately $2.6 million. Ms. Wagner has settled claims of the estate for the total amount of approximately $3.2 million, and has obtained a reduction of over $7 million in creditor claims against the estate. As of February 28, 2013, VCR had over $1.1 million in liquid assets, with accounts payable of approximately $288,000, mostly attributable to outstanding professional fees. Since the hearing on the Motion to Convert, the Trustee has filed motions for approval of settlements reached in connection with fraudulent transfer and preference actions in the amount of over $725,000.[9] The majority of those

---

[9]

| Docket No. | Adversary Proceeding No. | District Court Case No. | Amount of Settlement |
|---|---|---|---|
| 1274 | 12-1067 | 12-CV-00271 | $45,000.00 |
| 1276 | 12-1003 | 12-CV-00239 | $90,000.00 |
| 1277 | 12-1079 | 12-CV-00636 | $6,500.00 |
| 1288 | 11-1126 | 12-CV-00518 | $65,000.00 |
| 1289 | 12-1126 | N/A | $5,500.00 |
| 1295 | 12-1125 | 12-CV-00371 | $15,000.00 |
| 1300 | 12-1031 | 12-CV-00198 | $12,098.61 |
| 1301 | 12-1129 | 12-CV-00390 | $18,000.00 |
| 1302 | 12-1013 | 12-CV-00193 | $10,000.00 |
| 1306 | 12-1051 | 12-CV-00199 | $83,000.00 |

settlement amounts are in addition to the approximate $3.2 million of claims settled as of February 28, 2013.

Ms. Wagner has begun to evaluate whether, and to what extent, VCR's creditors could be paid. Several factors have affected her decision regarding when VCR should begin formulating its Chapter 11 plan. Ms. Wagner waited until judgment was entered against Douglas Vaughan in his criminal case in September of 2012. She believed that his conviction affected whether she would have to prove that VCR operated a Ponzi scheme in the fraudulent transfer actions. There has also been a dispute throughout the case regarding the amount and validity of the Internal Revenue Service's ("IRS") claim against VCR. The IRS filed a claim in the amount of $972,597.36, of which it seeks priority status for $708.353.57. *See* Claim No. 200. Ms. Wagner is attempting to resolve that issue with the IRS. Finally, VCR had several dispositive motions pending in the Bankruptcy Court that could affect how much money VCR will be able to recover from the investors in VCR's promissory note program. Brian Rowe, an accounting expert called by Wollen, testified that VCR could have filed a Chapter 11 plan in November, 2012.

In late 2012 or early 2013, Ms. Wagner began drafting what is sometimes known as a "rising tide" plan. A "rising tide" plan seeks to ensure that all investors receive an equal percentage distribution on their lost investments, considering both the prior payments from VCR and the distributions from the bankruptcy estate. Under this type of plan, more money will be distributed to investors who did not receive distributions from VCR than the investors who did

| 1307 | 12-1095 | 12-CV-00427 | $16,214.80 |
| 1308 | 12-1054 | 12-CV-00389 | $28,500.00 |
| 1309 | 12-1230 | 12-CV-00747 | $69,000.00 |
| 1318 | 12-1049 | N/A | $8,247.90 |
| 1319 | 12-1049* | N/A | $75,000.00 |
| 1326 | 12-1123 | 12-CV-00202 | $50,000.00 |
| 1329 | 12-1024 | 12-CV-00289 | $125,000.00 |
| 1354 | 12-1039 | 12-CV-00520 | $11,000.00 |
| | | **TOTAL:** | $733,061.31 |

*settlement with separate defendant.

receive distributions. On December 7, 2013, Ms. Wagner filed a report pursuant to 11 U.S.C. § 1106(a)(5) (the "1106 Report") explaining why she had not yet filed a plan and stating her intention to file a plan and disclosure statement by the end of 2012. Ms. Wagner amended the 1106 Report on February 13, 2013, stating that, due to pending motions to dismiss that raised various defenses to the fraudulent and preferential transfer actions, and her ongoing investigation into the claim of the IRS, she now anticipates filing a plan and disclosure statement in late spring of 2013.[10]

## DISCUSSION

A chapter 11 case may not be converted or dismissed under 11 U.S.C. § 1112(b) except for "cause." 11 U.S.C. § 1112(b)(1). Thus, the threshold issue under 11 U.S.C. § 1112(b) is "cause." *See In re Melendez Concrete, Inc.,* 2009 WL 2997920, *3 (Bankr.D.N.M. Sept. 15, 2009).[11] If the moving party fails to establish "cause," the Court's inquiry is complete, and the bankruptcy case will not be converted or dismissed. *See In re Hyatt,* 479 B.R. 880, 886 (Bankr.D.N.M. 2012)(J. Starzynski)(observing that until the movant has carried its burden of demonstrating "cause," the statutory directive that the court "shall convert the case" is not operative)(citation omitted). The movant bears the burden of establishing cause by a preponderance of the evidence. *Matter of Woodbrook Associates*, 19 F.3d 312, 317 (7th Cir. 1994) (citing 5 Collier on Bankruptcy ¶ 1112.03[2][a])(remaining citation omitted); *In re Brooks,* __ B.R. __, 2013 WL 1204843, *4 (Bankr.N.D.Ga. Feb. 7, 2013)(stating that the moving party "must first establish cause [under §1112(b)] by a preponderance of the evidence.")(citations omitted).

---

[10] Any findings of fact contained in the Discussion section, below, are incorporated by reference into the Findings of Fact.

[11] *See also, In re American Capital Equipment, LLC,* 688 F.3d 145, 161 (3rd Cir. 2012)(breaking 11 U.S.C. § 1112(b) into "a two-step process in which the court first determines whether there is "cause" to convert or dismiss")(citations omitted).

Section 1112(b)(4) lists sixteen nonexclusive grounds that constitute cause to convert or dismiss a Chapter 11 case.[12]  *See In re AmeriCERT, Inc.* 360 B.R. 398, 401 (Bankr.D.N.H. 2007)(stating that the list of grounds for "cause" under § 1112(b)(4) is not exhaustive).   Wollen relies on the following enumerated grounds for "cause" found under 11 U.S.C. § 1112(b)(4):

> (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
> (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter; and
> (J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court.

> 11 U.S.C. § 1112(b)(4).

With respect to the unexcused failure to timely satisfy a reporting or filing requirement, Wollen asserts that the Trustee has failed to satisfy the reporting requirements under 11 U.S.C.  § 1106(a)(3) and (4) and has failed to file a plan as required under 11 U.S.C. § 1106(a)(5).  The Court will address each ground in turn.

---

[12] Section 1112(b)(4) provides:

> For purposes of this subsection, the term 'cause' includes-(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; (B) gross mismanagement of the estate; (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public; (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors; (E) failure to comply with an order of the court; (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter; (G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor; (H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any); (I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief; (J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court; (K) failure to pay any fees or charges required under chapter 123 of title 28; (L) revocation of an order of confirmation under section 1144; (M) inability to effectuate substantial consummation of a confirmed plan; (N) material default by the debtor with respect to a confirmed plan; (O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and (P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

11 U.S.C. § 1112(b)(4).

*Substantial or Continuing Loss to or Diminution of the Estate; Absence of Reasonable Likelihood of Rehabilitation*

"Cause" under 11 U.S.C. §1112(b)(4)(A) requires *both* a substantial or continuing loss to or diminution of the estate *and* the absence of a reasonable likelihood of rehabilitation. *Hyatt,* 479 B.R. at 887 (citing *In re Fall,* 405 B.R. 863, 867 (Bankr.N.D.Ohio 2008), *aff'd,* 2009 WL 974538 (N.D.Ohio 2009)(remaining citation omitted).[13]  "Rehabilitation" under this section means "'to reestablish a business.'"  *In re Brutsche,* 476 B.R. 298, 302 (Bankr.D.N.M. 2012)(j. Starzynski)(quoting 7 Collier on Bankruptcy ¶ 1112.04[6][a][ii] (Alan J. Resnick and Henry J. Sommer eds., 16th ed.) (footnotes omitted))(additional citation omitted).[14]  The Trustee concedes that she does not seek to rehabilitate the Debtor for the purpose of operating a business. Thus, for "cause" to exist under this section, Wollen need only demonstrate that there has been a substantial or continuing loss to or diminution of the estate.

In evaluating whether the Debtor has suffered continuing losses or diminution of the estate under 11 U.S.C. §1112(b), the Court considers all relevant information, including the bankruptcy estate's financial history and financial prospects and the financial records on file in the case.  *See In re Gateway Access Solutions, Inc.,* 374 B.R. 556, 564 (Bankr.M.D.Pa. 2007)("the Court looks to both the financial prospects of the Debtor and the financial records filed with the Court" to determine whether there has been a continuing loss or diminution to the estate).  *See also, In re The AdBrite Corp.,* 290 B.R. 209, 215 (Bankr.S.D.N.Y. 2003)(stating that "a court must make a full evaluation of the present condition of the estate, not merely look at the

---

[13]*See also In re Bay Area Material Handling, Inc.,* 76 F.3d 384, *2 (9th Cir. 1996)(unpublished)(stating that "cause" to convert "exists where there is both 'continuing loss to or diminution of the estate' and 'absence of a reasonable likelihood of rehabilitation[.]'")(citation omitted).

[14]*See also, In re ARS Analytical, LLC,* 433 B.R. 848, 862 (Bankr.D.N.M. 2010)(J. Starzynski)(rehabilitation "contemplates the successful maintenance or reestablishment of the debtor's business operations.")(citing *In re Vallambrosa Holdings, L.L.C.,* 419 B.R. 81, 89 (Bankr.S.D.Ga. 2009)); *In re Terra Bentley II, LLC,* 2012 WL 6721054, *4 (Bankr.D.Kan. Dec. 26, 2012)(noting that because § 1112(b)(4) "uses the word 'rehabilitation' rather than 'reorganization,' § 1112(b)(4) has been interpreted as requiring something more than a liquidating plan.")(citing 7 Collier on Bankruptcy, ¶ 1112.04[6][a][ii])).

debtor's financial statements.")(citation omitted). Under certain circumstances, negative cash flow alone can establish a continuing loss to or diminution of the estate for purposes of establishing the first element of 11 U.S.C. § 1112(b)(1). *See Loop Corp. v. United States Trustee,* 379 F.3d 511, 516 (8th Cir. 2004)(concluding, "[i]n the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cash flow-including that resulting only from administrative expenses-effectively comes straight from the pockets of the creditors.").[15] Diminution of the estate may also be established by showing "declining asset values." *In re Wahlie,* 417 B.R. 8, 11 (Bankr.N.D.Ohio. 2009).[16]

Here, the Trustee has already liquidated the Debtor's tangible estate assets; the only remaining estate assets consist of the Debtor's litigation claims against third parties, including the potential recovery of assets for the benefit of the estate represented by the Trustee's fraudulent and preferential transfer actions filed against investors in VCR's promissory note program. Wollen asserts that there has been a continuing loss to or diminution of the estate, particularly as a result of ongoing litigation costs associated with these fraudulent and preferential transfer actions. This Court disagrees.

As is true with all litigation that seeks a money judgment, litigation costs are incurred before the plaintiff actually recovers any money. The Trustee has filed over 150 suits in an effort to recover funds for the benefit of the estate. Approximately sixty-seven were transferred to the

---

[15]*See also, In re Park,* 436 B.R. 811, 816 (Bankr.W.D.Va. 2010)(substantial or continuing loss or diminution to the estate exists where the debtor continues to incur losses post-petition, maintains a negative cash flow, or has no reliable source of income and an inability to pay current expenses)(citing *In re Quail Farm, LLC,* 2010 WL 1849867 (Bankr.N.D.W.V. May 5, 2010)); *In re Keeley and Grabanski Land P'ship,* 460 B.R. 520, 536 (Bankr.D.N.D. 2011)(negative cash flow); *In re Motel Properties, Inc.,* 314 B.R. 889, 894 (Bankr.S.D.Ga. 2004)("a post-petition negative cash flow and an inability to satisfy current expenses constitute a lost to or diminution of the estate.")(citations omitted); *In re Schriock Const., Inc.,* 167 B.R. 569, 575 (Bankr.D.N.D. 1994)(the requirement of continuing loss to or diminution to the estate "can be satisfied by demonstrating that the debtor incurred continuing losses or maintained a negative cash flow position after the entry for the order of relief.")(citations omitted).
[16]*See also, Schriock,* 167 B.R. at 575 n. 8 (noting that "[t]he 'continuing loss' or 'diminution' standard can be satisfied even though the debtor may have had a positive postpetition cash flow if the value of estate assets are actually depreciating in an economic, rather than an accounting sense.")(citing 5 Collier on Bankruptcy ¶ 1112.03[i], at 1112-18 (15th ed. 1994)).

United States District Court following the withdrawal of the reference. A portion of those proceedings have settled. Approximately forty-four suits remain pending as adversary proceedings before this Court. The total amount of the claims the Trustee asserted in her fraudulent and preferential transfer actions is approximately $37 million. *See* Exhibit B-K. The Trustee has successfully withstood motions to dismiss filed in several of these adversary proceedings on a wide variety of grounds. *See, e.g., Wagner v. Pruett,* Adversary No. 11-1185 (Docket No. 20); *Wagner v. Cunningham,* Adversary No. 11-1227 J (Docket No. 19); *Wagner v. Wilson,* Adversary No. 12-1142 (Docket No. 27); *Wagner v. Levann,* United States District Court Case No. CV-12-817 (Docket Nos. 254 and 236). She has also settled some of these adversary proceedings. Including the funds the Trustee has realized from the sale of the Debtor's tangible assets, from the recovery of accounts receivable, and from the settlements of the fraudulent and preferential transfer actions, the Trustee has so far recovered over $3.5 million. *See* Monthly Operating Report - February 2013 (Docket No. 1290).

Wollen argues that the adversary proceedings the Trustee has settled so far represent the "low-hanging fruit," that the Trustee cannot expect to fare as well with the remaining adversary proceedings, and the ongoing litigation costs are unreasonably high relative to the Trustee's prospects of recovery in the remaining fraudulent and preferential transfer actions. No evidence was presented to substantiate these assertions. The Trustee may or may not realize a similar percentage of recovery from the remaining adversary proceedings. But many of the fraudulent and preferential transfer actions are similarly situated such that a significant portion of the litigation costs will be the same regardless of the total number of adversary proceedings that remain. The Court granted the Trustee's motion for case management procedures which provides for a consolidated trial on issues common to all of the fraudulent and preferential

-13-

actions pending in this Court. *See* Order Authorizing and Approving Case Management Procedures Governing Multiple Adversary Proceedings Arising under 11 U.S.C. §§ 544, 547, 548 and 550, Misc. Case No. 12-00006 (Docket No. 5). Consolidating common issues for trial will minimize litigation costs. Further, the Trustee already has incurred a substantial portion of the total cost of litigating the adversary proceedings.

Wollen also points out that the Trustee's professional fees, including the fees of the Trustee's accounting firm, will be paid as administrative expenses that will deplete the estate. Where a debtor has stopped operating its business, a continuing diminution can occur based on the accumulation of administrative expenses without a reasonable prospect of payment. *See Loop Corp.,* 379 F.3d at 515 (where a liquidating Chapter 11 debtor who has ceased business operations but continues to incur administrative expenses, the debtor suffers from a negative cash flow which can constitute a "continuing loss to or diminution of the estate" for purposes of 11 U.S.C. § 1112(b)); *Citi-Toledo Partners,* 170 B.R. 602, 606 (Bankr.N.D.Ohio. 1994)(continuing administrative expenses coupled with the fact that the debtor's project remained idle demonstrated a diminution to the estate).

The Debtor's monthly operating report for the period from February 1 to February 28, 2013 shows that the total cumulative amount of professional fees for legal and accounting and other services incurred is over $2 million, of which $287,915.31 remains unpaid. *See* February 2013 Monthly Operating Report - Docket No. 1290. The Trustee incurred these fees not only in connection with fraudulent and preferential transfer litigation, but also to discharge her duties to investigate fraud, prepare tax returns, deal with the Securities and Exchange Commission, and administer the bankruptcy case. The report also reflects a cumulative amount of collected funds in the amount of $3,777,980.80, of which $1,145,614.75 remains available to the estate. *Id.* The

-14-

Trustee has sufficient cash on hand to pay all Chapter 11 administrative expenses. Compared to the assets on hand as of the date the case was filed, the total value of the assets recovered by the Trustee that are still property of the bankruptcy estate thus far has increased.[17] The Trustee estimated that she will incur additional fees in connection with the fraudulent and preferential transfer actions in the amount of $600,000. The Trustee also estimated that she will recover more than $600,000 for the benefit of the estate through her pursuit of such litigation. Unlike other liquidation cases in which cause to convert has been found where the debtor has ceased doing business and continues to sustain losses based on accumulating administrative expenses without the prospect of recoveries that offset the losses, here, the Trustee has expended professional fees for the purpose of building up the value of future assets for the benefit of the estate in the form of further recoveries from the fraudulent and preferential transfer actions.

The Court concludes that Wollen has failed to demonstrate a continuing loss to or diminution of the bankruptcy estate sufficient to establish cause to convert this Chapter 11 case to Chapter 7. The Court bases this conclusion on the following: 1) the amount of liquid assets in the estate, net of estate payables, has increased since commencement of this Chapter 11 case; 2) the amount of funds received by the estate has exceeded the sum of total estate disbursements and unpaid estate payables; 3) the unpaid administrative expenses do not exceed the cumulative funds available in the estate to pay those expenses; 4) the Trustee has already realized more than $3 million from her settlements of various adversary proceedings, is continuing to settle claims,

---

[17]Comparison of Monthly Operating Reports from March 22, 2010, filed by VCR before the appointment of the Trustee, April 2010 filed by the Trustee after her appointment, and March 2013 filed on April 22, 2013:

| Month | Funds Available for Operations | Accounts Receivable | Accounts Payable |
|---|---|---|---|
| February 2010 | $45,745.12 | $538,395.43 | $31,780.48 |
| April 2010 | $67,743.59 | | |
| April 2013 | $1,203,489,83 | $561,828.20 (from settlements and judgments) | $287,915.31 |

-15-

and substantial claims remain;  5) the Trustee has made a substantial investment in her pending claims and has already incurred a substantial portion of the cost to litigate those claims; and 6) the Trustee has taken reasonable and appropriate steps to minimize the litigation costs associated with her prosecution of her remaining claims.

*Failure to Satisfy the Trustee's Requirements of 11 U.S.C. § 1106(a)(3), (4), and (5)*

Unless the court orders otherwise, a Chapter 11 trustee is charged with investigating the "acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business . . . and any other matter relevant to the case or tot eh formulation of a plan." 11 U.S.C. § 1106(a)(3).  A Chapter 11 trustee must also file a report explaining the results of the investigation.  *See* 11 U.S.C. § 1106(a)(4).[18]  There is no strict deadline for the filing of the report, but a Chapter 11 trustee must file the report "as soon as practicable."  11 U.S.C. § 1106(a)(4).

The Trustee filed her 1106 Report on December 7, 2012.  It consists of a fifty-four page report and an attached Litigation Information Summary Spreadsheet.  The 1106 Report includes an explanation of the Debtor's background, its note investment program, the criminal actions involving the Debtor's principal, Douglas Vaughan and Martha Runkle, and the action filed against the Debtor by the Securities and Exchange Commission.  The 1106 Report also describes the Trustee's efforts in investigating and reconstructing the Debtor's books and records,

---

[18] Section 1106(a)(4) provides:
    As soon as practicable –
        (A) file a statement of any investigation conducted under paragraph (3) of this subsection, including any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate; and
        (B) transmit a copy of any such statement to any creditors' committee or equity security holders' committee, to any indenture trustee, and to such other entity as the court designates.

11 U.S.C. § 1106(a)(4)

-16-

identifying potential claims against the Debtor's related entities and officers and key employees of the Debtor, and potential fraudulent and preferential transfer claims.

Wollen argues that the Trustee herself felt she could have filed the 1106 Report as early as June 2010, and complains that the Trustee did not file the 1106 Report until *after* Wollen filed the Motion to Convert. Wollen's argument that the Trustee could have filed the 1106 Report in June 2010 is based on the fact that the Trustee filed a motion to convert in June of 2010, shortly after her appointment. But the Trustee had not completed her investigation of the Debtor's business transactions, and had not completed her analysis of the Debtor's alleged Ponzi scheme and the potential fraudulent and preferential transfer claims as of June of 2010. The Securities and Exchange Action was stayed because the pending criminal action against the Debtor's principal, and, as a result, the civil action involving the Securities and Exchange Commission was not fully resolved until December 2012. The criminal action involving the Debtor's principal was ongoing through September 2012 when the United States District Court entered a judgment against him and sentenced him to prison. She filed her 1106 Report on December 7, 2012. On February 15, 2013, the Trustee filed a supplement to her 1106 Report. *See* Chapter 11 Trustee's First Supplement to her Report Pursuant to 11 U.S.C. § 1106(a)(3) and (a)(4) ("Supplemental Report")(Docket No. 1264). The Supplemental Report describes the status of the fraudulent and preferential transfer actions pending in this Court and in the United States District Court, reports that the Internal Revenue Service has filed a sizeable claim but that the Trustee is in discussions with the IRS to investigate the possibility of the IRS agreeing to subordinate its claims to investors in VCR's promissory note program, and states that the Trustee intends to file a "Rising Tide" plan and disclosure statement in late spring of 2013. *Id.*

Wollen complains that the Trustee's 1106 Report contains only "bulk estimates" of total litigation costs, but no case-by-case analysis, fails to include a detailed analysis of potential recovery, and offers no cost benefit analysis for pursuing the fraudulent transfer claims. The investigative reporting requirements under 11 U.S.C. § 1106(a)(3) do not require such case-by-case projections of costs associated with anticipated potential litigation, but only direct the trustee to report on "the acts, conduct, assets, liabilities and financial condition of the debtor," including any facts relating to fraud or misconduct by the Debtor in managing its business affairs. 11 U.S.C. § 1106(a)(3) and (4)(A). The Trustee must also report on "any other matter relevant to the case or a formulation of a plan," which could include projections regarding the potential litigation. The Trustee's Litigation Information Spreadsheet (Exhibit B-K) attached to the Trustee's 1106 Report adequately accomplishes the task of reporting on specific fraudulent and preferential transfer actions. Further, as determined above, the Trustee's pursuit of the fraudulent and preferential transfer actions and other litigation has resulted in a significant recovery of funds for the benefit of the estate notwithstanding the litigation costs associated with such lawsuits. Finally, the Trustee testified that she weighed the potential for recovery against the costs of litigation in determining which preferential and fraudulent transfer actions she would pursue. The Trustee has also timely filed detailed MORs throughout the period she has served as Trustee.

Based on the foregoing, the Court finds that Wollen has not demonstrated "cause" based on the Trustee's alleged failure to comply with the requirements of 11 U.S.C. §§ 1106(a)(3) and (4). The 1106 Report and supplement adequately describes the investigations the Trustee undertook to assess the Debtor's business dealings and financial situation, uncover the alleged Ponzi scheme, and determine what course of action to take to administer the bankruptcy estate,

including the pursuit of fraudulent and preferential transfer actions. The Trustee diligently

conducted her investigation of the Debtor as required under 11 U.S.C. § 1104(a)(3) and filed her

1106 Report as soon as practicable after she completed her investigation.

Under 11 U.S.C. § 1106(a)(5) the Trustee is required to take one of three alternative

actions. That section provides:

> as soon as practicable, file a plan under section 1121 of this title, file a report of why the
> trustee will not file a plan, or recommend conversion of the case to a case under chapter
> 7, 12, or 13 of this title or dismissal of the case.

11 U.S.C. § 1106(a)(5).

The Trustee must act under this section "as soon as practicable." *Id.* Approximately two

months after her appointment as Trustee, the Trustee filed a motion to convert this case to

Chapter 7. She withdrew the motion to convert on September 7, 2010. Wollen complains of the

Trustee's decision to withdraw the motion to convert. The Trustee testified that she withdrew

the motion to convert for the following reasons: 1) to collect outstanding broker commissions;

2) to pursue insurance coverage litigation; and 3) because the SEC and the creditor's committee

wanted the monthly reporting information that would be covered in the MORs. These reasons

adequately explain why the Trustee chose to withdraw the motion to convert. In addition, given

that over two years have passed since the Trustee withdrew the motion to convert, it is simply

too late for Wollen to complain that the Trustee's withdrawal of the motion to convert evidences

a failure to comply with the requirements of 11 U.S.C. § 1106(a) or constitutes cause for

conversion.

Wollen also contends that the Trustee has failed to comply with 11 U.S.C. § 1106(a)(5)

because she has not filed a plan. To date, the Trustee has not filed a plan. Nor does the Chapter

11 Trustee's Report Pursuant to 11 U.S.C. § 1106(a)(3) and (a)(4), filed December 7, 2012,

include a section regarding the Trustee's intentions with respect to a Chapter 11 plan, though the Supplemental Report indicates that the Trustee intends to file a plan and disclosure statement sometime in late spring of 2013. Wollen's expert, Brian Rowe, stated that the earliest the Trustee could have formulated and filed a plan and disclosure statement would have been in November of 2012. The Trustee also testified that she intends to file a plan.

In order to evaluate whether a Chapter 11 trustee has satisfied the requirements of 11 U.S.C. § 1106(a)(5) it is appropriate to note what is generally appropriate for Chapter 11 debtors in possession who are also bound to comply with that section. *See In re Marshall,* 2010 WL 3959612, *39 (Bankr.E.D.Va. Oct. 11, 2010)(citing *In re Gusam Restaurant Corp.,* 737 F.2d 274, 275-76 (2nd Cir. 1984)(finding that §1106(a)(5) applies to debtors in possession)(remaining citation omitted)). The Bankruptcy Code does not impose a specific deadline within which a Chapter 11 debtor, other than a small business debtor, must file a plan. As the *Marshall* court explained, 11 U.S.C. § 1106(a)(5) does not impose a deadline, and the time frame within which a debtor in possession files a chapter 11 plan "varies widely and is dependent on the circumstances of the case." *Id.* In short, the general Chapter 11 practice "is that a chapter 11 plan is filed at an appropriate time." *Id.*

Based on the particular circumstances of the Debtor's bankruptcy case, including the pending criminal action against the Debtor's principal, the volume of records the Trustee reviewed and her limited access to records while the criminal action was pending, the investigation of the Debtor's business by the Securities and Exchange Commission, and the substantial time and resources the Trustee has devoted to the fraudulent and preferential transfer actions, the Court finds that it has not yet been practicable for the Trustee to file a plan. "As soon as practicable" must be applied within the context of the facts and circumstances particular

-20-

to each case, and not as a fixed deadline. *Marshall,* 2010 WL 3959612 at *39 (citing *In re New Life Fellowship, Inc.,* 198 B.R. 813 (Bankr.W.D.Okla. 1996)). The Court, therefore, finds that the Trustee has not failed to satisfy the requirements of 11 U.S.C. § 1106(a)(5). Consequently, Wollen has not demonstrated "cause" for dismissal under 11 U.S.C. §1112(b)(4)(F).

*Failure to file a Disclosure Statement or Plan – 11 U.S.C. § 1112(b)(4)(J)*

Under 11 U.S.C. §1112(b)(4)(J), "cause" exists if the Debtor has failed, within the applicable time periods fixed under the Bankruptcy Code in Chapter 11 cases or by order of the court, to: 1) file a disclosure statement; 2) file a plan;  or 3) confirm a plan.  11 U.S.C. §1112(b)(4)(J).  Only small business debtors are constrained by deadlines fixed under the Bankruptcy Code for filing a disclosure statement, filing a plan, and confirming a plan in a Chapter 11 case. *See* 11 U.S.C. §1121(e)(2) and (3)(requiring a small business debtor to file a plan and disclosure statement no later than 300 days after the date of the order for relief, unless the debtor obtains an extension of the time before the expiration of the deadline);  11 U.S.C. 1129(e)(requiring a small business debtor to obtain confirmation no later than 45 days after the plan is filed, unless the debtor obtains an extension of time).  The Debtor is not a small business debtor, and the Court has not entered an order fixing a deadline for the Debtor to file a disclosure statement or plan.   Consequently Wollen has failed to establish "cause" under 11 U.S.C. § 1112(b)(4)(J).

*Other Asserted Grounds for Conversion*

By focusing on the significant amount of administrative expenses incurred by the Trustee, Wollen reasons that conversion to Chapter 7 with would result in a cost savings for the estate.  The Court finds that the relative cost of proceeding under Chapter 7 versus Chapter 11 is relatively inconsequential in the context of this bankruptcy case if a Chapter 7 trustee were to

-21-

continue to vigorously prosecute the fraudulent and preferential transfer actions. The real risk to the estate is the prospect of changing trustees if the case were converted to Chapter 7. Both parties point out that the existing Trustee could be appointed as Chapter 7 trustee if the case were converted. But there is no guaranty that the Trustee would serve as Chapter 7 trustee upon conversion, particularly since the defendants in the fraudulent and preferential transfer actions may well have the votes to control the election of a Chapter 7 trustee. *See* Schedules and Claims Register; 11 U.S.C. § 702 (providing that creditors may elect a person to serve as chapter 7 trustee). Because the Trustee has invested so much in pursuing the fraudulent and preferential transfer actions, the comparative potential cost savings to the estate of proceeding in Chapter 7 does not outweigh the risk to the estate of changing trustees at this stage in the bankruptcy case.

Wollen also argues that "cause" for conversion exists when there is no reasonable prospect for confirmation of a Chapter 11 plan, relying, in part, on *In re FRGR Managing Member LLC,* 419 B.R. 576 (Bankr.S.D.N.Y. 2009). In *FRGR,* the Court granted the United States Trustee's motion to convert based on the debtor's apparent inability to fund and timely confirm a plan, reasoning that the debtor was not engaged in an ongoing business and its only source of funding for a Chapter 11 plan was the debtor's potential litigation claims. *FRGR,* 419 B.R. at 584. *See also In re Rey,* 2006 WL 2457435, *7-8 (Bankr.N.D.Ill. Aug. 21, 2006)(converting a chapter 11 case based on an inability to fund a chapter 11 plan, where the debtor had few assets other than potential litigation claims).

Here, the Trustee testified that she intends to file a liquidating plan that will be funded in large part from the recoveries from the fraudulent and preferential transfer actions that the Trustee has filed against investors in the Debtor's alleged Ponzi scheme. A liquidation plan is an acceptable form of reorganization under Chapter 11. *See, In re Deer Park, Inc.,* 136 B.R. 815,

818 (9th Cir. BAP 1992)(stating that through 11 U.S.C. § 1129(a)(11) the Bankruptcy Code recognizes "that liquidation may be contemplated in a valid Chapter 11 plan of reorganization, despite the label 'reorganization.'"), *aff'd* 10 F.3d 1478 (9th Cir. 1993); *In re PC Liquidation Corp.* 383 B.R. 856, 866-67 (E.D.N.Y. 2008)(acknowledging that "'[w]hile the primary purpose of Chapter 11 is reorganization, liquidation is not prohibited. Reorganization encompasses rehabilitation and may include liquidation.'")(quoting *In re Copy Crafters Quickprint, Inc.,* 92 B.R. 973, 985-986 (Bankr.N.D.N.Y. 1988)(internal quotations and citations omitted)); *In re Tejano,* 135 B.R. 686, 688 (Bankr.D.Kan. 1991)(acknowledging that liquidation through Chapter 11 is permissible in some instances.). Further, nothing in the Bankruptcy Code prohibits a chapter 11 trustee from filing a liquidating plan. *See* 7 Collier on Bankruptcy, ¶ 1106.03[12][b] (Alan N. Resnick and Henry J. Somme eds., 16th ed.)(acknowledging that although conversion to chapter 7 is generally preferred in instances where the debtor will be liquidated, in some instances, an orderly liquidation through a Chapter 11 liquidating plan may be a more attractive option). The Trustee has already recovered significant sums into the estate from the settlement of fraudulent transfer adversary proceedings. Whether the Trustee will be able to confirm the type of "rising tide" plan she now contemplates filing is not a question the Court should decide in connection with the pending Motion to Dismiss. As determined above, the demands of the chapter 11 case to date have made it impracticable for the Trustee yet to file a plan. She should be given an opportunity to do so.

CONCLUSION

Based on the evidence now before the Court, the Court concludes that Wollen has failed to demonstrate "cause" to convert this Chapter 11 case to Chapter 7. Moreover, even if "cause" had been established, 11 U.S.C. § 1112(b) provides that one option available to the Court is to

-23-

appoint a Chapter 11 Trustee in lieu of conversion where such appointment is in the best interest

of creditors and the estate. 11 U.S.C. §1112(b). The appointment of a Chapter 11 Trustee has

already occurred. The Trustee was appointed shortly after this bankruptcy case was filed and has

carried out her duties under 11 U.S.C. § 1106, including her pursuit of fraudulent and

preferential transfer actions in an effort to recover funds for the benefit of the bankruptcy estate.

She has, in fact, successfully recovered a significant sum. It is in the best interests of creditors as

a whole, and the estate, for the Trustee to continue to serve in this Chapter 11 case rather than to

convert this case to a case under Chapter 7. At this stage in the case, and where the

preponderance of the evidence fails to demonstrate a continuing loss or diminution to the estate,

the Court will not convert the case. The Court will enter a separate order denying Wollen's

Motion to Convert.


ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket:   May 21, 2013

COPY TO:

Edward A. Mazel
James A. Askew
Askew & Mazel, LLC
Attorneys for Judith Wagner, Chapter 11 Trustee
320 Gold Ave SW Ste 300A
Albuquerque, NM 87102

Jennie D Behles
Attorney for Julius Wollen, as Trustee of the Julius M. and Diane Wollen
        Revocable Trust dated October 20, 1993
PO Box 7070
Albuquerque, NM 87194-7070

-24-

William F. Davis
Attorney for Official Committee of Noteholders
6709 Academy NE, Suite A
Albuquerque, NM 87109

United States Trustee
PO Box 608
Albuquerque, NM 87103-0608