## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re:   THE VAUGHAN COMPANY, REALTORS,                    11-10-10759 JA

    Debtor.

## AMENDED[1] MEMORANDUM OPINION REGARDING CONFIRMATION
## OF THE SECOND AMENDED PLAN

Judith Wagner, Chapter 11 Trustee ("Trustee") of the estate of The Vaughan Company, Realtors ("Debtor" or "VCR") seeks confirmation of a Chapter 11 plan. The Court held a final confirmation hearing on November 20, 2015 and took the matter under advisement. VCR defrauded hundreds of innocent investors through its promissory note program which paid earlier investors with funds contributed by later investors. Through her plan, the Trustee seeks to effectuate a "rising tide" distribution method because she believes that type of distribution method is the most equitable way to distribute limited funds among investors defrauded by the scheme. The Unsecured Creditors' Committee objected to confirmation, asserting that the "rising tide" distribution method fails to comply with the confirmation requirements under the Bankruptcy Code. After carefully reviewing the applicable Bankruptcy Code sections in light of the relevant case law and the parties' arguments, the Court concludes that the plan is not confirmable.

### BACKGROUND AND PROCEDURAL HISTORY

The Debtor commenced this voluntary Chapter 11 case on February 22, 2010. *See* Voluntary Petition (Docket No. 1). On the same date VCR's principal shareholder and president, Douglas F. Vaughan, commenced a personal Chapter 11 case (Case No. 10-10763). On March 23, 2010, the Securities and Exchange Commission ("SEC") filed a civil complaint against Mr.

---

[1] This amended memorandum opinion corrects typographical errors in a chart setting forth the number of votes cast in Class 4 and the number of holders of Class 4 claims voting to accept the Plan. The memorandum opinion has not otherwise been amended.

Vaughn and VCR in the United States District Court for the District of New Mexico alleging violations of federal securities laws (*See* D.N.M., Case No. 1:10-cv-00263-MV-WPL). The SEC alleged in its complaint that Mr. Vaughan perpetrated a fraudulent scheme by causing VCR to offer investors promissory notes bearing high, fixed rates of interest (the "Note Program"), which Mr. Vaughn falsely represented would be paid with profits generated by VCR.

In light of the SEC's civil suit against Mr. Vaughan and VCR, the United States Trustee ("UST") moved the Court for the appointment of a Chapter 11 Trustee or, alternatively, for the case to be converted to a case under Chapter 7 of the Bankruptcy Code (Docket No. 163). On April 26, 2010, the Court entered a stipulated order directing the UST to immediately appoint a Chapter 11 Trustee (Docket No. 185). Three days later, on April 29, 2010, the Court approved the UST's application to appoint Judith A. Wagner as Chapter 11 Trustee (Docket No. 195).

FINDINGS OF FACT

The Court makes the following findings of fact:

1.  The Ponzi Scheme

VCR operated a legitimate real estate development and real estate brokerage business. VCR initiated its Note Program in or around 1993. Mr. Vaughan induced persons to invest in the Note Program by offering high rates of interest, claiming their investments would be used for legitimate business activities, and misrepresenting the safety of the Note Program. VCR operated its Note Program as a Ponzi scheme since at least 2005 but probably from a much earlier date. While operating the Note Program as a Ponzi scheme, VCR made payments to investors under the Note Program with funds it received from new Note Program investors. By 2009, VCR owed almost $75 million to investors under the Note Program. Because of the

fungible nature of money and the vast commingling of VCR's funds, it was not possible to trace an investor's funds after VCR deposited the funds in its bank account.

   2.   Fraudulent and Preferential Transfer Actions and Estate Assets

The Trustee aggressively asserted preferential and fraudulent transfer actions. She filed 167 adversary proceedings. In the large majority of those adversary proceedings, the Trustee asserted fraudulent transfer claims against investors in the Note Program. The Trustee negotiated court approved settlements or obtained judgments in almost all of the adversary proceedings. Most of the funds in the estate available for distribution to creditors are attributable to recoveries in those adversary proceedings. The Trustee collected many of the judgments and settlements she obtained on the estate's behalf, and is in the process of determining collectability of the few that remain.

The estate has estimated cash on hand, as of November 19, 2015, of $3,742,894.15. The estate is likely to receive an additional $400,000.00 by the end of 2015 from a settlement of the estate's claims against US Title Insurance. Upon receipt of these additional funds, the estate's estimated cash on hand will increase to $4,142,894.15 less any further amounts expended prior to receipt of the funds. In addition to its cash on hand, the estate currently holds title to approximately 84 acres of land received in a settlement of a fraudulent transfer action brought by the Trustee. This land is currently listed by the estate's realtor for $420,000.00.

   3.   Equity Holders.

On the petition date, VCR had two shareholders, Jim Salazar and Mr. Vaughan. Mr. Salazar held a 15% interest and Mr. Vaughan held an 85% interest. Mr. Vaughn forfeited all his shareholder interest in VCR in a plea agreement he made with the United States Attorney. *See United States v. Vaughan,* D.N.M., Case No. 11-cr-404-BB, Docket No. 125, p. 7, ¶ 14. Mr.

Salazar assigned his shareholder interest to the VCR bankruptcy estate pursuant to a settlement agreement of the estate's claims against him. Accordingly, the only remaining shareholder interest in VCR is property of the bankruptcy estate.

    4.    <u>The Plan</u>

On March 11, 2015, the Trustee filed her Plan of Liquidation Dated March 11, 2015 (Docket No. 2053). The Trustee filed two amendments to the plan, one on April 30, 2015 (Docket No. 2174) and the other on July 21, 2015 (Docket No. 2469). The Chapter 11 Trustee's Second Amended Plan of Liquidation Dated July 21, 2015 (Docket No. 2469) (the "Plan") is the plan presently before the Court for confirmation. The Court entered an order approving the Disclosure Statement for the Plan (Docket No. 2470) on July 24, 2015 (Docket No. 2473). No other parties have filed a plan.

*Classes*

The Plan divides claims against the estate and interests into five separate classes: secured claims; priority unsecured claims; general unsecured claims/trade vendors; restitution claims; and shareholder interests. Class 1 consists of all secured claims, and Class 2 consists of all claims entitled to priority under 11 U.S.C. § 507(a) (excluding administrative expense and priority tax claims). While the Plan proposes to pay all Class 1 and Class 2 claims in full, there are currently no allowed Class 1 claims, and all allowed Class 2 claims have been paid in full. Class 3 consists of all allowed unsecured claims that are neither entitled to priority under 11 U.S.C. § 507(a) nor "Restitution Claims," as defined in the Plan. The total amount of allowed Class 3 claims is $300,615.12. The Plan proposes to pay thirty-five percent (35%) of each allowed Class 3 claim, or $105,215.29 total.

*Class 4 Restitution Claims*

Class 4 consists of all "Restitution Claims," which are defined in the Plan as (a) unsecured, non-priority claims filed in the case by persons who invested in the Note Program, limited to the amount of the restitution claimant's principal investment less any funds paid pre-petition by VCR to or for the benefit of the restitution claimant, except claims that have been fixed by settlement agreement or court order; and (b) Informal Restitution Claims. An Informal Restitution Claim is an investor claim proof of which was timely filed in Mr. Vaughn's Chapter 11 case but not in the VCR case, and which would have been a valid allowable claim against VCR's bankruptcy estate if timely filed in the VCR case.

Holders of Restitution Claims ("Restitution Claimants") in Class 4 consist only of those investors who, as of the petition date, received less from VCR than the principal amount they invested under the Note Program VCR operated as a Ponzi scheme. Investors who received all or more than the amount of their principal investment do not have allowed claims under the Plan.[2] Unless a claim has been fixed by settlement agreement or court order, the Plan calculates and fixes the claim amount for each Restitution Claimant based on the claimant's net pre-petition recovery – the allowed claim is the gross amount the investor contributed to VCR under the Note Program less the total amount VCR distributed to the investor on account of his or her investment as of the petition date, regardless of how that payment had been applied.[3] Under this method of calculating the amount of an allowed Restitution Claim, all pre-petition payments VCR made to an investor as part of the illicit Note Program are considered a return of principal.

---

[2] *See* Disclosure Statement – Executive Summary ("A VCR Investor who received all or more than his or her Principal Investment does not have a Restitution Claim, and has no claim at all under the Plan.").

[3] *See* Chapter 11 Plan, p. 10 (defining "Restitution Claim" as "an unsecured non-priority Claim of a VCR Investor filed in the Bankruptcy Case, limited to the amount of the Restitution Claimant's Principal Investment less any funds previously paid pre-petition by VCR to or for the benefit of the Restitution Claimant . . . . except that for all claims which have been fixed by settlement agreement or court order, the amount fixed by settlement agreement or order shall be the amount of the Restitution Claim.").

The amounts of the Restitution Claims vary in differing degrees from the amounts reflected in the proofs of claim filed in the VCR case and in Mr. Vaughan's Chapter 11 case. The amount of the Restitution Claims total $17,687,336.65, consisting of $16,072,440.33 in claims timely proof of which was filed in the VCR case and $1,614,896.32 in Informal Restitution Claims.

Additionally, the Plan combines certain Restitution Claims for purposes of determining the claimant's Principal Return Percentage, which is the percentage return on the total principal amount of the investment pre-petition, assuming all payments are applied to principal. For example, all or part of some Restitution Claims arises from the claimant's use of funds from their individual retirement account as their principal investment in the Note Program (an "IRA Claim"). To the extent an individual holds an IRA Claim and a Restitution Claim that is not an IRA Claim, those claims are combined under the Plan for purposes of determining the claimant's Principal Return Percentage. Likewise, Restitution Claims held as community property by more than one person are treated under the Plan as a single claim for purposes of determining the claimants' Principal Return Percentage. However, separate Restitution Claims held by different, though potentially connected, persons (e.g., husband and wife or corporation and principal) are not combined under the Plan for purposes of determining the claimants' Principal Return Percentage. This treatment of what constitutes a separate or single claim for purposes of distribution is consistent with the voting procedures order this Court entered in connection with the Plan. (*See* Docket Nos. 2468 and 2472).

*The Rising Tide Method of Distribution to Holders of Class 4 Restitution Cla*ims

The Plan proposes a "rising tide" method of distribution for payment of Restitution Claims. Under this method, the amount the Trustee distributes is calculated so that each holder

of a Restitution Claim receiving a distribution from the Trustee receives the same percentage of the principal amount of the original investment from a combination of all amounts VCR paid the investor pre-petition and the amount the Trustee pays the investor from estate funds under the Plan. The total amount of the pre-petition return on a Restitution Claimant's principal investment is "treated as a 'distribution' on par with a distribution made by the Trustee under the Plan." Plan, p. 12.

To determine the Plan distribution, the Trustee starts by calculating a "Principal Return Percentage" for each Restitution Claimant by dividing the total amount of each Restitution Claimant's return of principal (after reapplying all pre-petition payments to principal if not originally so applied) by the gross amount of the Restitution Claimant's principal investment. Then, based on a uniform formula, the Trustee calculates a Distribution Percentage based on the amount of funds available for distribution to the Restitution Claimants. If the Principal Return Percentage is less than the Distribution Percentage, the Restitution Claimant "will receive a distribution calculated as (Distribution Percentage minus Principal Return Percentage) times Principal Investment." *See* Disclosure Statement, Section 3.5.2 - p. 19; Chapter 11 Plan, p. 15. If the Principal Return Percentage is greater than the Distribution Percentage, the Restitution Claimant will not receive a distribution from the bankruptcy estate.

Under the rising tide method of distribution, the Distribution Percentage is sometimes known as the Tide Level below or above which a Restitution Claimant does or does not receive a further distribution. The amount of the estate's cash on hand allotted to pay Restitution Claims under the Plan is at least $3,329,229.76, which is sufficient to bring the Tide Level to 41.57%.[4]

---

[4] The actual Tide Level under the Plan likely will rise above 41.57% as a result of the Trustee's future projected collection and liquidation efforts and the Trustee not expending all Reserve Funds on remaining administrative expenses.

The Trustee generally describes the rising tide method of distribution contained in the Plan as follows:

> Restitution Claimants holding "Allowed Restitution Claims" will be paid from "Restitution Funds," as those terms are defined in Article I of the Plan. But, recognizing that some Restitution Claims had significantly larger proportionate losses of their Principal Investment than others, the Plan attempts to equalize proportionate distributions to Restitution Claimants on account of Principal Investment. This is done by effecting a "rising tide" method of distribution of Restitution Funds – the Trustee applies a uniform formula, first making distributions to holders of Allowed Restitution Claims in preference to those Restitution Claimants who received little or no Principal Return so as to equalize the total pre- and post-bankruptcy percentage return of Principal Investment received and to be received by all Restitution Claimants. Thus, each Restitution Claimant will receive a distribution based on the total Restitution Funds available, the amount of the holder's Allowed Restitution Claim and application of a "Principal Return Percentage" designed to equalize the total percentage return on principal investment.

Disclosure Statement, Executive Summary.

*Class 5 Shareholder Interests*

Class 5 of the Plan includes all shareholder interests in the Debtor. As stated above, the only remaining shareholder interest is property of the bankruptcy estate. The Plan proposes to subordinate the estate's equity interest in the Debtor to all other claims in accordance with the judgment obtained against the Debtor by the SEC. *See Judgment as to Defendant the Vaughan Company, Realtors*, D.N.M., Case. No. 10-CV-00263-MV-WPL, Docket No. 66, p. 6, Art. VIII. Due to the large amount of allowed claims in the case and the subordination of Class 5, there will be no distribution to holders of Class 5 interests under the Plan.

    5.    <u>Voting on the Plan</u>

Class 1 and Class 2 are unimpaired under the Plan. No votes were cast by holders of claims in those classes. Class 3 accepted the Plan with seven of the thirty eligible class members casting ballots to accept the Plan, $121,887.06 in dollar amount accepting the Plan, one blank ballot submitted, and no votes to reject the Plan.

-8-

Class 4 voted to accept the Plan by 97.81% in number and 98.09% in dollar amount of votes cast[5] as follows:

| Class 4 Votes Cast | Total Eligible Class 4 Votes | Voting to Accept | Voting to Reject | Dollar Amount Voting to Accept | Dollar Amount Voting to Reject |
|---|---|---|---|---|---|
| 137 | 273 | 134 | 3 | $10,034,031.90 | $195,272.45 |

Three holders of Restitution Claims affirmatively voted to reject the Plan. The following chart summarizes the amounts of those rejecting ballots and the comparative distributions to those claimants under the Rising Tide method of distribution set forth in the Plan and under a "Net Investment" method of distribution.[6]

| Holder of Claim | Yati Bryan | James Bryan | Amy Lapp Stuehrenberg |
|---|---|---|---|
| **Amount of Claim Voting to Reject** | $3,130.78 | $185,448.00 | $6,693.67 |
| **Principal Return Percentage** | 61.41% | 42.58% | 44.22% |
| **Distribution Under the Plan at a 41.57% Tide Level (Rising Tide Method)** | $0.00 | $0.00 | $0.00 |
| **Distribution Under Net Investment Method at 18.82%** | $589.21 | $34,901.31 | $1,259.75 |

No votes were cast by holders of Class 5 interests.

---

[5] Six of the Class 4 ballots cast in favor of the Plan were submitted on behalf of deceased or incapacitated Class 4 claimants by persons claiming to be the deceased or incapacitated Class 4 claimant's heir, power of attorney, executor, or personal representative. The voting calculation set forth above includes these votes as votes accepting the Plan; however, disregarding these votes would not materially alter the voting results. One ballot was submitted accepting the Plan but was unsigned and was not included in the voting calculation set forth above. Nine ballots were submitted with no discernable vote either accepting or rejecting the Plan. The voting calculation set forth above deems these votes as abstentions; however, deeming these votes as votes to reject the Plan would not materially alter the voting results.

[6] Under the "Net Investment" method of distribution, all investors in a Ponzi scheme receive a pro rata distribution under a plan determined by applying the same percentage to the difference between the principal amount of the investment and the total dollars the investor received from the debtor before the commencement of the bankruptcy case on account of the investment. This difference is the amount the Trustee used to determine the allowed amount of each Restitution Claim under the Plan. Under the net investment method of distribution, the Trustee would pay 18.82% of each Restitution Claim ($3,329,229.76 (total available for distribution among Class 4 claims) ÷ $17,687,336.65 (total amount of Class 4 claims)). Without the Informal Restitution Claims, the pro rata percentage return would increase to 20.71%. The Net Investment method sometimes instead is called the "Net Loss" method.

Case 10-10759-j11    Doc 2603    Filed 12/21/15    Entered 12/21/15 14:29:56 Page 9 of 27

6.    Trustee's Liquidation Analysis

The remaining cost of administering the estate would likely be higher if the case were converted to a Chapter 7 case on the proposed Plan effective date than if the Plan were confirmed. For example, while the Trustee currently pays no bank fees, a Chapter 7 trustee must pay a bank and software fee, which is as much as 1.75% per annum,[7] to the bank holding the estate's funds during the administration of the estate. Further, a Chapter 7 trustee's only available avenue to liquidate the amount of Restitution Claims would be to incur the expense of objecting to claims, rather than having the Court set the allowed amounts of the claims through confirmation of the Plan. On the other hand, the estate would realize some cost savings if the case converted to a Chapter 7 case by no longer needing to produce monthly operating reports or incur UST fees. With that said, the Court lacks sufficient evidence to quantify the difference between the remaining administrative expenses the estate would incur if the Plan were confirmed and if the case were converted to a Chapter 7 case. However, quantifying that difference would not change the result the Court reaches on confirmation of the Plan.

7.    Satisfaction of Certain Confirmation Requirements

Since her appointment some five years ago, the Trustee has administered the VCR bankruptcy estate diligently. Among other things, she has filed operating reports timely, and has retained and paid professionals in accordance with Court orders. She has complied with the requirements of the Bankruptcy Code. The Trustee has paid tax claims and Chapter 11 administrative expenses timely and properly wound up VCR's employee retirement plan.[8]

---

[7] Assuming the hypothetical Chapter 7 trustee held all of the estate's cash on hand in the estate's bank account charging the maximum bank and software fee, and that the estate's cash on hand remained at or above $4,000,000.00 through the duration of administration, the estate would incur at least $70,000.00 in bank and software fees each year until the estate is closed.

[8] The Trustee paid all allowed priority tax claims, as defined in § 507(a)(8). The Trustee has also paid all other allowed unsecured claims entitled to priority under § 507(a), except for administrative expense claims. As of

The Trustee proposed the Plan in good faith to achieve what she determined, with the assistance of counsel, is a fair and equitable distribution of estate assets consistent with the requirements of the Bankruptcy Code. All payments made or to be made by the Trustee for services or costs and expenses in or in connection with the case, or in connection with the Plan and incident to the case, were approved by or would be subject to the approval of the Court, as reasonable. All disclosures required by 11 U.S.C. § 1129(a)(5)[9] were made. VCR does not charge any rates regulated by a governmental regulatory commission. The Plan contains the provisions required by § 1129(a)(9). All impaired classes voted to accept the Plan, which includes an affirmative vote by impaired classes to accept the Plan excluding the votes of insiders. The Plan is a liquidating plan, and is not likely to be followed a subsequent reorganization of the Debtor or a further liquidation. The Trustee is current on payment of UST fees, and the Plan adequately provides for payment of further UST fees. VCR is not obligated to provide any further retiree benefits. Any transfers of property under the Plan would comply with applicable nonbankruptcy law. The Plan provides adequate means for its implementation.

## DISCUSSION

Confirmation of a Chapter 11 plan is governed by § 1129, which conditions confirmation on satisfaction of all applicable confirmation requirements contained in § 1129. *See* 11 U.S.C. § 1129(a) ("The court shall confirm a plan only if all of the following requirements are met")). "[T]he proponent of the plan has the burden of producing evidence that the statutory requirements for confirmation are met." *In re Stratford Associates Ltd. P'ship,* 145 B.R. 689,

---

November 18, 2015, the total amount of the estate's unpaid administrative expense claims was $79,673.36. The Trustee estimates that unpaid administrative expenses for the estate through the end of 2015 will total $208,449.10. Prior to its cessation of operations, VCR sponsored a 401(k) plan for the benefit of its employees. The Trustee terminated the VCR sponsored retirement plan and filed a final tax return and plan administration documents allowing any participants in that plan to remove their money from the plan or roll over their investment into another plan.

[9] All further statutory references in this opinion are to the Bankruptcy Code, which is Title 11 of the United States Code.

-11-

693 (Bankr.D.Kan. 1992) (citations omitted).  Because all classes entitled to vote on the Plan have accepted the Plan,[10] the cramdown requirements under § 1129(b) do not come into play.[11] Only the official Committee of Note Holders (the "Committee") filed an objection to confirmation of the Plan.[12]  Only two confirmation requirements remain at issue:  1) whether the Plan provides for the same treatment for each claim within Class 4 as required under § 1129(a)(1)[13] and § 1123(a)(4); and 2) whether the Plan satisfies the best interest of creditors test under § 1129(a)(7).  The Committee argues that those statutory provisions have not been satisfied due to the Trustee's use of the rising tide method of distribution to holders of Restitution Claims.

As this Court previously observed, a Ponzi scheme typically involves the payment of a return on an investment, not from profits from the success of the underlying business enterprise, but from principal sums the debtor receives from newly attracted investors.  *Wagner v. Pruett, (In re Vaughan Company, Realtors),* 477 B.R. 206, 219 (Bankr.D.N.M. 2012) (quoting *Sender v.*

---

[10] Three Restitution Claimants in Class 4 voted to reject the plan, but the members of Class 4 who cast ballots overwhelmingly voted to accept the plan.  *See* 11 U.S.C. § 1126(c) ("A class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . that have accepted or rejected such plan.").

[11] Subsection (b) allows a plan proponent to "cramdown" confirmation over an impaired rejecting class if certain additional requirements are met.  *See* 11 U.S.C. § 1129(b); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank,* 132 S.Ct. 2065, 2069, 182 L.Ed.2d 967 (2012) ("Section 1129(b) . . . permit[s] confirmation of nonconsensual plans— commonly known as 'cramdown' plans" if certain conditions are satisfied.).

[12]  The Trustee would have the Court ignore the Committee's objection because it is not representative of the Class 4 Restitution Claimants as a whole.  But even when there are no objections to confirmation, the Court has an independent duty to make sure that the plan proponent has satisfied all Chapter 11 confirmation requirements.  *See In re MJ Metal Products, Inc.,* 292 B.R. 702, 704 (Bankr.D.Wyo. 2003) ("The court has an independent duty to determine whether a plan complies with § 1129.") (citations omitted); *In re Digital Impact, Inc.,* 223 B.R. 1, 6 (Bankr.N.D.Okla. 1998) ("Notwithstanding that there were no unresolved objections to the Plan, this Court has an independent duty to ensure that the Plan complies with all provisions of Section 1129 of the Bankruptcy Code and to determine the scope of its jurisdiction.") (citation omitted). *See also In re Bright Harvesting, Inc.,* 2015 WL 7972717 (Bankr.D.N.M. Dec. 4, 2015) (stating in the context of Chapter 12 that "'[t]he Court also has an 'independent duty to ensure that the requirements of [the Bankruptcy Code] are satisfied, even if no objections to confirmation have been made.'") (quoting *In re Young Broad, Inc.,* 439 B.R. 99, 139 (Bankr.S.D.N.Y. 2010) (remaining citation omitted)). .

[13] Section 1129(a)(1) requires compliance with all other applicable provisions in Chapter 11, which would include § 1122(a)(4).  *See* 11 U.S.C. § 1129(a)(1) ("The court shall confirm a plan only if . . . .[t]he plan complies with the applicable provisions of this title.").

-12-

*Nancy Elizabeth R. Heggland Family Trust (In re Hedged-Investments Associates, Inc*.), 48 F.3d

470, 471 n.2. (10th Cir. 1995) (remaining citation omitted)).  Earlier investors realize a return on

their investment through the investments made by other defrauded investors even though both

earlier investors and later investors were defrauded by the scheme.

  I.  <u>The Rising Tide Method of Distribution Explained</u>

  The aim of the rising tide method of distribution to investors in a Ponzi scheme is to

equalize, or "catch up" investors in a Ponzi scheme who have received a smaller return on the

principal amount of their investment with investors who have received a larger return on their

investment.  The rising tide method is predicated on investors in a Ponzi scheme not being

entitled to the accrual of any interest on their investment amounts, and the recharacterization of

all interest payments as the return of principal.  Under the rising tide distribution method, each

investor receiving a distribution from the receiver or bankruptcy trustee receives the same

percentage of the principal amount of the investor's original investment from a combination of

all amounts the investor received previously plus the amount the receiver or bankruptcy trustee

pays the investor.  The equalized percentage is known as the Tide Level.

  To illustrate how the rising tide method of distribution works, assume the Tide Level is

50%.  Investors A, B and C each invested $100,000 in the Ponzi scheme.  Prior to the

receivership or bankruptcy case, Investor A had been repaid $60,000 (a 60% pre-petition return

on investment), Investor B $40,000 (40%) and Investor C $10,000 (10%).  Under the rising tide

method of distribution, the receiver or bankruptcy trustee would distribute nothing to Investor A

(because Investor A already received more than 50% of the principal investment); $10,000 to

Investor B ($40,000 + $10,000 = $50,000); and $40,000 to Investor C ($10,000 + $40,000 =

$50,000).  Each investor receiving a distribution from the receiver or bankruptcy trustee thereby

receives a return of 50% of the amount of his or her original investment from a combination of payments made prior to the receivership or bankruptcy case and payments made by the receiver or bankruptcy trustee.[14]

II.   Use of the Rising Tide Method of Distribution in Receiverships to Achieve Equity in Making Distributions to Victims of a Ponzi Scheme

The rising tide method of distribution is commonly used in receivership proceedings initiated by the Securities and Exchange Commission or the Commodity Futures Trading Commission to distribute funds to investors defrauded by a Ponzi scheme. *See SEC v. Huber,* 702 F.3d at 906 ("Rising tide appears to be the method most commonly used (and judicially approved) for apportioning receivership assets.") (citations omitted). *See also, e.g., United States Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.,* No. 07 C 3598, 2010 WL 960362 (N.D.Ill. Mar. 15, 2010) and *Commodity Futures Trading Comm'n v. Equity Fin. Group, LLC.,* No. Civ.04-1512 RBK AMD, 2005 WL 2143975 (D.N.J. Sept. 2, 2005).

---

[14] *In SEC v. Huber*, 702 F.3d 903 (7th Cir. 2012), the Seventh Circuit used the following illustration to describe the "rising tide" method:

[I]magine that three investors lose money in a Ponzi scheme. *A* invested $150,000 and withdrew $60,000 before the scheme collapsed, so his net loss was $90,000. *B* invested $150,000 but withdrew only $30,000; his net loss was $120,000. *C* invested $150,000 and withdrew nothing, so lost $150,000. Suppose the receiver gets hold of $60,000 in assets of the Ponzi scheme—one-sixth of the total loss of $360,000 incurred by the three investors ($90,000 + $120,000 + $150,000). We'll call these recovered assets "receivership assets."

. . . .

Under the rising tide method, withdrawals are considered part of the distribution received by an investor and so are subtracted from the amount of the receivership assets to which he would be entitled had there been no withdrawals. . . . In our example, the total of withdrawn plus receivership assets is $150,000 ($60,000 + $30,000 + $0 [the withdrawals] + $60,000 [the receivership assets]), but there is only the $60,000 in such assets to distribute. *A*, having been deemed (as a consequence of the rising tide approach) to have "recovered" $60,000 before the collapse of the Ponzi scheme, is entitled to nothing from the receiver, as otherwise the remaining sum of withdrawals and receivership assets—a total of $90,000 ($30,000 in withdrawals, all by *B*, and $60,000 in receiver-ship assets)—would be insufficient to bring the remaining investors up to anywhere near *A* 's level. . . . . The result, since under the rising tide method withdrawals are treated as compensation, is that *A* would have been "compensated" to the tune of $75,000 ($60,000 withdrawn + $15,000 in receiver assets), *B* $50,000 ($30,000 + $20,000), and *C* $25,000 (the balance of receiver assets, *C* having had no withdrawals).

*SEC v. Huber*, 702 F.3d at 904-905.

In a receivership proceeding, the court has wide discretion under its general equitable powers to approve any method of distribution that is fair and equitable. *See SEC v. Byers*, 637 F. Supp.2d 166, 174 (S.D.N.Y. 2009) (observing that the court has broad authority to approve a receiver's proposed distribution plan); *Equity Fin. Group,* 2005 WL 2143975, at * 24 ("The Court has wide discretion in determining the appropriate form of relief in a receivership in equity.") (citation omitted); *Lake Shore Asset Mgmt.*, 2010 WL 960263, at * 6 ("The court is afforded wide discretion in approving a distribution plan of receivership funds.") (citing *SEC v. Enterprise Trust Co.,* 559 F.3d 649, 652 (7th Cir. 2009)); *SEC v. Enter. Trust Co.*, No. 08-cv-1260, 2008 WL 4534154, *3 (N.D.Ill. Oct. 7, 2008) ("There are no hard rules governing a district court's decisions in matters like these. The standard is whether a distribution is equitable and fair in the eyes of a reasonable judge.") (citations omitted).

Many courts overseeing receivership proceedings, tasked with approving a plan for distributing funds to victims of a Ponzi scheme, have determined that the rising tide method of distribution is the most fair and equitable method of making distributions. *See SEC v. Huber,* 702 F.3d at 906 (collecting cases). These courts reason that investors should not receive different percentages of their original investment given that the investors were all equally victimized by the Ponzi scheme. Earlier investors in a Ponzi scheme generally fair better than later investors because they realize greater returns before the Ponzi scheme collapses. The rising tide method is designed so early investors do not receive a windfall from later investors' money, and later investors are not penalized based on the timing of their investments. *See generally*, *Equity Fin. Group,* 2143975 at * 24; *Lake Shore Asset Mgmt.*, 2010 WL 960263, at * 9. The percentage return on investment is equalized under the rising tide distribution method by preventing investors from receiving more than their proportionate share of the res through further

-15-

distributions, and by preventing investors who have already received more than their share from receiving even more investor funds via a distribution of the estate at the expense of those victims who have received less.[15]

> II.  Use of the Rising Tide Method of Distribution
> Under the Trustee's Chapter 11 Plan

In a Chapter 11 case, unlike a receivership proceeding, a liquidating plan cannot simply aim to achieve the result the court determines is the most fair and equitable under the circumstances. The plan must comply with the confirmation requirements under the Bankruptcy Code.[16] The Committee objects to the rising tide method, asserting that it runs afoul of the confirmation requirements under § 1129(a)(1) (to the extent it incorporates § 1123(a)(4)) and § 1129(a)(7). The Court will address each of these sections in turn.

> 1.  § 1123(a)(4) – Same Treatment Within a Class

Section 1123(a)(4), as incorporated in the confirmation requirements by § 1129(a)(1), governs treatment of particular claims within a class. It provides:

> A plan shall—

>> Provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.

11 U.S.C. § 1123(a)(4).

In other words, a plan proponent can satisfy § 1123(a)(4) in two ways: 1) by providing the same treatment of each claim within the class; or 2) by obtaining an agreement from the class member

---

[15] *Cf. SEC v. Parish,* 2:07-cv-00919-DCN, 2010 WL 5394736, *8 (D.S.C. Feb.10, 2010) ("To adopt the Net Loss method would be to permit those investors who have already received more than their proportionate share of the res to receive even more investor funds via a distribution of the estate, at the expense of those victims who have not received any payments.").

[16] Bankruptcy courts, including courts within the Tenth Circuit, have confirmed plans in Ponzi scheme cases with rising tide distribution schemes. *See, e.g., In re Waterford Funding, LLC,* No. 09-22584, 2012 WL 1098566 (Bankr.D.Utah Mar. 30, 2012); *In re Randall,* No. 10-37546 (Bankr.D.Utah Oct. 28, 2013) (No. 1367); *In re Bayside Ventures, LLC,* Case No. 07-15612-RBR (Bankr.S.D.Fla. Oct. 30, 2008) (No. 342). But none of these decisions contain an analysis of the issues the Committee raises. It appears that the cases confirming Chapter 11 plans with rising tide distribution schemes were uncontested.

to receive less favorable treatment of its claim. *See In re Dow Corning Corp.*, 244 B.R. 634, (Bankr.E.D.Mich. 1999) (recognizing that § 1123(a)(4) expressly allows for disparate treatment if holders of claims receiving less favorable treatment so agree). Here, the three Restitution Claimants in Class 4 who voted to reject the Plan have not agreed to less favorable treatment of their claims. Consequently, the Trustee must satisfy the "same treatment" requirement with respect to those claims. *Cf. In re AOV Indus., Inc.*, 792 F.2d 1140, 1150 (D.C.Cir. 1986) (creditor claimed that he "was the victim of unequal treatment among class members, which is prohibited by 11 U.S.C. § 1123(a)(4).").

Section 1123(a)(4) is one of several sections of the Bankruptcy Code that implements the fundamental bankruptcy policy of equality of distribution to similarly situated creditors.[17] Another section is § 1129(b)(1), which provides (when read in conjunction with § 1129(a)(8)) that if a class of claims has not accepted a plan, the plan cannot discriminate unfairly with respect to treatment of that class relative to other classes of claims. But if a class accepts the plan, that proscription does not apply. The "same treatment" requirement of § 1123(a)(4) operates to protect individual claimants within the same class even when the class has accepted the plan. The standard to determine whether two claims within the same class are given the "same treatment" can be gleaned, in part, from § 1123(a)(4) itself. The second clause of that section – which allows for "less favorable" treatment with the claimant's consent – implies that two claims are given the same treatment when neither claim is treated more favorably than the other.

---

[17] *See Begier v. IRS*, 496 U.S. 53, 58, 110 S.Ct. 2258, 2262-2263, 110 L.Ed.2d 46 (1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code. According to that policy, creditors of equal priority should receive pro rata shares of the debtor's property."); *In re C.W. Mining Co.*, 798 F.3d 983, 987 (10th Cir. 2015) (a prime bankruptcy policy is the equality of distribution among creditors of the debtor) (citation omitted); *In re Kessler, Inc.*, 142 B.R. 796, 800 (W.D. Mich. 1992) ("A fundamental policy found in the overall structure of the Bankruptcy Code is the equality of distribution to similarly situated creditors.") (citations omitted).

The Bankruptcy Code does not otherwise define "same treatment" for purposes of § 1123(a)(4). *See AOV Indus.,* 792 F.2d at 1152 (observing that "neither the Code nor the legislative history precisely defines the standards of equal treatment . . ."); *In re Adelphia Communications Corp.,* 368 B.R. 140, 249 (Bankr.S.D.N.Y. 2007) (same). The *AOV* court observed further that "the most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members." *AOV,* 792 F.2d at 1152.[18] It is equally clear that "the 'same treatment' standard of Section 1123(a)(4) does not require that all claimants within a class receive the same amount of money." *Findley v. Blinken (In re Joint E. & S. Dist. Asbestos Litig.),* 982 F.2d 721, 749 (2d Cir. 1992), *modified on reh'g,* 993 F.2d 7 (2d Cir. 1993).[19] Section 1123(a)(4) "does not require identical treatment for all class members in all respects under a plan." *Adelphia Communications,* 368 B.R. at 249. *Accord In re Dana Corp.,* 412 B.R. 53, 61 (S.D.N.Y. 2008) ("'the same' does not mean 'identical'").

The Trustee asserts that her proposed rising tide distribution method satisfies § 1123(a)(4)'s "same treatment" requirement because it applies the same formula to all of the Restitution Claims, relying, in part, on *Dow Corning*. There, each claimant could elect to settle its claim on terms specified by the plan for members of that class and receive expedited payment, or could choose to litigate the claim against the debtor. *See Dow Corning,* 244 B.R. at 670. The *Dow Corning* court concluded the plan satisfied the same treatment requirement because it applied the same formula to compute the amounts payable to class members that elected settlement and gave each class member the same opportunity to elect litigation instead of settlement. *Id.* A key factor in the court's decision was the same opportunity afforded to

---

[18] *See also* 7 Collier on Bankruptcy ¶ 1123.01[4] (Alan N. Resnick and Henry J. Sommer, eds., 16th ed. 2012) (Section 1123(a)(4) "certainly prohibits different percentage settlements to members of the same class as well as unequal consideration tendered for equal payment.") (citations omitted).
[19] On rehearing, the court did not have to resolve any issues raised by the requirements of § 1123(a)(4).

claimants in the treatment of their disputed, unliquidated claims.[20] The court characterized the distribution of available funds on a pro rata basis to similarly situated creditors as a foundational principle of bankruptcy law. *Id.* at 667. The court then explained:

> This foundational principle of bankruptcy law is simple to apply when all claims within a class are undisputed and liquidated. The court need ensure only that available proceeds are divided equally based upon the known values of the claims. The situation changes considerably, however, when a class is composed of disputed and unliquidated claims. Under this scenario, the precise value of the claims will not be known. And short of actually liquidating the claims, there is no way to determine whether a proposed settlement is offering to pay claimants the same percentage recovery on their respective claims.

> *Id*. at 667-668.

The court addressed the second clause of §1123(a)(4) – which allows unequal treatment with the claimant's consent – by pointing out that claimants electing the settlement option are necessarily agreeing to less favorable treatment, if and to the extent litigation would have resulted in a greater recovery. *Id.* at 668-669.[21]

This Court agrees that giving each claimant in a class the same opportunity to receive the same treatment of their claim will, in many cases, mean that the plan satisfies the same treatment requirement of § 1123(a)(4). Such same opportunity can mean that no claim is treated less favorably than any other claim in the class unless the holder of a claim so agrees.

With these concepts in mind, the Court will examine whether the Plan's rising tide method for making distributions to holders of Class 4 Restitution Claims complies with the

---

[20] Other courts analyzing the "same treatment" requirement of § 1123(a)(4) likewise focus on opportunity. *See, In re W.R. Grace & Co.,* 729 F.3d 311, 327 (3d Cir. 2013) ("What matters, then, is not that claimants recover the same amount but that they have equal opportunity to recover on their claims.") (citation omitted); *Dana Corp.,* 412 B.R. at 62 ("The key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity."); *In re Washington Mut., Inc.,* 442 B.R. 314, 361 (Bankr.D.Del. 2011) (finding that the plan did not satisfy the same treatment requirements of § 1123(a)(4) where all claimants were not given the same opportunity to participate in the rights offering).

[21] *See also, Washington Mut.,* 442 B.R. at 355 ("Providing different treatment to a creditor who agrees to settle instead of litigating is permitted by section 1123(a)(4)".) (citing *Dow Corning,* 255 B.R. at 472 (remaining citation omitted)).

-19-

requirements of § 1123(a)(4). Critical to this examination is the nature of an "allowed claim" under the Bankruptcy Code. The claims within Class 4 are all nonpriority, unsecured claims in liquidated amounts fixed by the Plan. Section 502 governs allowance of claims. The claims allowance process requires the court to "determine the amount of [the] claim … *as of the date of the filing of the [bankruptcy] petition*," with exceptions not applicable here. 11 U.S.C. § 502(b) (emphasis added). The Plan is consistent with the requirements of Title 11 for determining the allowed amount of each Restitution Claim as of the petition date — the Plan fixes the amount of each Restitution Claim as the amount of each claimant's total principal investment less any payments that claimant received on account of the investment before the petition date (*i.e.* the amount of the "Net Loss"). *See* Plan, p.7. The Net Loss reflects the amount of a restitution claim that would be valid and enforceable as of the petition date under applicable nonbankruptcy law. *See Pruett* 477 B.R. at 223-224 (discussing restitution claims of investors in the context of Ponzi schemes).

At least three holders of Class 4 claims have not agreed to less favorable treatment (the "Rejecting Creditors"). Because the amount of each allowed Class 4 claim is determined as of the petition date (February 22, 2010), the Plan must provide the same treatment relative to the amount of each Class 4 claim as of that date. The rising tide method of distribution violates § 1123(a)(4) because it provides the "same treatment" of each Class 4 claim relative to the original principal investment amounts at the time those investments were made, not relative to the amount of each allowed Restitution Claim determined as of the petition date. The Plan treats pre-petition distributions "on par" with distributions from bankruptcy estate assets. Plan, p. 12. But those pre-petition distributions cannot be counted in determining how the Plan treats the allowed Restitution Claims because the Plan must give the same treatment to claim amounts as

of the petition date, and the amount of each allowed Restitution Claim as of the petition date has already been reduced by all pre-petition distributions.

The Plan does not provide the "same treatment" to all claims in Class 4 because the Rejecting Creditors will not receive the same opportunity for distribution on their claims (determined as of the petition date) as will Restitution Claimants with greater percentage Net Losses on their principal investments. For example, a Restitution Claim that is paid nothing from the estate under the Plan because the principal return percentage is greater than the Tide Level is treated less favorably than a Restitution Claim that is paid 40% from the estate under the Plan, even though the disparate treatment equalizes the overall percentage return for both claimants relative to the total amounts invested. The claims of the three Rejecting Creditors, therefore, do not receive the "same treatment" as the other claims in Class 4 as required by § 1123(a)(4).

What distinguishes this case from *Dow Corning, W.R. Grace & Co.,* and *Dana Corp.*, is the liquidated nature of the Restitution Claims as of the petition date and the lack of opportunity for the Rejecting Creditors to choose an option that gives them the same opportunity to receive the same treatment of their claim (i.e. the claim amount determined as of the petition date) as other members within the class.

2.  §1129(a)(7) – Best Interest of Creditors Test

Confirmation also requires satisfaction of the so called "best interest of creditors"[22] test under § 1129(a)(7). It provides:

> With respect to each impaired class of claims or interests—
>     (A) Each holder of a claim or interest of such class—

---

[22] *See In re Valley View Shopping Center, L.P.,* 260 B.R. 10, 29 (Bankr.D.Kan. 2001) ("Section 1129(a)(7) is often referred to as the 'best interest of creditors' test.") (citing *In re Embassy Properties North, Ltd. P'ship,* 196 B.R. 172, 176 (Bankr.D.Kan. 1996)).

(i)      has accepted the plan; or

(ii)    will *receive or retain* under the plan *on account of such claim* or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date

11 U.S.C. § 1129(a)(7) (emphasis added).

This test applies to each creditor within a class, not each class as a whole. *Valley View*, 260 B.R. at 29 ("The plain language of § 1129(a)(7) makes clear that this test applies to each creditor rather than to each class of creditors").[23] To satisfy § 1129(a)(7), a creditor that has not accepted the plan must receive or retain "under the plan property that has a value, as of the effective date of the plan, that is not less than the amount such creditor would receive [or retain] if the debtor's assets were liquidated under Chapter 7 of the bankruptcy code." *In re Pikes Peak Water Co.*, 779 F.2d 1456, 1460 (10th Cir. 1985). In other words, "'each non-accepting member [must] receive [or retain] at least as much as they would in a Chapter 7 liquidation.'" *In re Experient Corp.*, 535 B.R. 386, 411 (Bankr.D.Colo. 2015) (quoting *In re Paige*, 439 B.R. 786, 797 (D. Utah 2010), *aff'd*, 685 F.3d 1160 (10th Cir. 2012)).

The Committee contends that the Plan does not satisfy § 1129(a)(7) with respect to the Restitution Claimants who voted to reject the Plan because such claimants will not receive any distribution of estate funds under the Plan.[24] The Trustee counters that the Committee ignores the import of the word "retain" as used in § 1129(a)(7), and that in a Chapter 7 liquidation case a trustee could similarly effect a rising tide distribution of the kind proposed by the Trustee. This Court disagrees.

---

[23] *See also* 7 Colliers on Bankruptcy ¶ 1129.02[7][b] (Alan N. Resnick and Henry J. Sommer, eds., 16th ed. 2012) ("Section 1129(a)(7) operates on the individual creditor or interest holder level.").

[24] Because there are rejecting creditors in Class 4, the Court need not address the argument that non-voting creditors are deemed to have accepted the plan for purposes of satisfying § 1129(a)(7).

-22-

Section 1129(a)(7) requires the Court to compare: a) the value of the property each rejecting Class 4 claimant would receive or retain under the Plan as of its effective date on account of the claim, with b) the value of the property each rejecting Class 4 claimant would receive or retain in a hypothetical Chapter 7 case determined as if the VCR case were converted on the Plan's proposed effective date. *See* 7 Collier on Bankruptcy¶ 1129.02[7][b][iv] (Alan N. Resnick and Henry J. Sommer, eds., 16th ed. 2012) (the Chapter 7 liquidation analysis under §1129(a)(7) is performed as of the effective date of the plan). The Trustee argues that under the Plan, a Restitution Claimant will "retain" all payments made to the claimant pre-petition, and will "receive" the amount, if any, to be distributed to the claimant under the Plan. Similarly, according to the Trustee, in a Chapter 7 case a Restitution Claimant would "retain" all payments made to the claimant pre-petition, and would "receive" the amount, if any, to be distributed to the claimant by the Chapter 7 Trustee under § 726(b).

This argument fails because it discounts the importance of the phrase "on account of such claim" contained in § 1129(a)(7)(A)(ii). The modifier "on account of" means "because of" and recognizes that for property to be retained on account of a claim there must be a causal relationship between holding the claim and retaining the property. *See Bank of America Nat'l Trust and Sav. Ass'n v. 203 North LaSalle Street P'ship*, 526 U.S. 434, 450-451, 119 S.Ct. 1411, 1420, 143 L.Ed.2d 607 (1999).[25] Restitution Claimants would retain pre-petition payments

---

[25] In *LaSalle*, the Supreme Court addressed the meaning of the "on account" of modifier as used in § 1129(b)(2)(B)(ii), which codifies what is commonly known as the absolute priority rule. Section 1129(b)(2)(B)(ii) provides that "'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan *on account of* such junior claim or interest any property'" *LaSalle,* 526 U.S. at 442 (quoting § 1129(b)(2)(B)(ii)) (emphasis added). The Supreme Court listed various sections of the Bankruptcy Code in which "on account of" is used to mean "because of." *Id.* at 451-452. The Supreme Court concluded that "under the commonsense rule that a given phrase is meant to carry a given concept in a single statute . . . the better reading of subsection (b)(2)(B)(ii) recognizes that a causal relationship between holding the prior claim or interest and receiving or retaining property is what activates the absolute priority rule." *Id.* at 451. Under this reasoning, interpreting "on account of" to mean "because of," and requiring a causal relationship, applies equally to § 1129(a)(7).

-23-

received from VCR regardless of whether they have a claim against the bankruptcy estate, and the Trustee has no ability to bring an action that would require them to return any pre-petition payments.[26]  Thus, there is no causal relationship between the claim and retaining the pre-petition payments.  The pre-petition payments would not be retained "on account of" the claim.

To illustrate this here, Yati Bryan, James Bryan and Amy Lapp Stuehrenberg (together, defined above as the "Rejecting Creditors") voted to reject the Plan.  The Rejecting Creditors hold Restitution Claims in the amounts of $3,130.78, $185,448.00 and $6,693.67, respectively. Each received payments from VCR pre-petition on account of their investments in the Note Program, and their claims represent Net Losses.  The Trustee asserted no claims against any of them.  There is no evidence that the Trustee could recover all or part of the amounts VCR paid to any of the Rejecting Creditors under Chapter 5 of the Bankruptcy Code or otherwise, regardless of whether they had a claim against the estate.  Accordingly, there is no causal relationship between the claims of the Rejecting Creditors and their retention of the amounts they received pre-petition from VCR, and the Rejecting Creditors will not retain anything under the Plan "on account of" their claims.

The same analysis holds true in the hypothetical Chapter 7 case.  There is no evidence that upon conversion, the Chapter 7 trustee could recover all or part of the amounts VCR paid to any of the Rejecting Creditors under Chapter 5 of the Bankruptcy Code or otherwise, regardless

---

[26] The period within which the Trustee could commence an avoidance action against the Restitution Claimants has long expired.  *See* 11 U.S.C. § 546 (establishing the statute of limitations deadline for commencing an action under §§ 544, 545, 547, 548, or 553 as the later of 2 years after the entry of the order for relief, or 1 year after the appointment of a Chapter 11 trustee, if the appointment occurs before the expiration of the 2 year period).  The Trustee was appointed on April 29, 2010.

of whether they had a claim against the estate.[27]  Accordingly, the Rejecting Creditors would not retain anything in the hypothetical Chapter 7 case "on account of" their claims.

In the hypothetical Chapter 7 case, the Rejecting Creditors would receive a pro rata distribution based on the amount of their allowed Restitution Claims determined as of the petition date as a percentage of all allowed claims entitled to the same priority.  *See* 11 U.S.C. § 726(b).[28]  By contrast, under the Plan the Rejecting Creditors would receive either no distribution or a distribution that is substantially less than the amount they would receive from a Chapter 7 trustee under § 726(b).  As discussed above, under the Plan or in the hypothetical Chapter 7 case, the Rejecting Creditors do not retain anything on account of their claims.  Thus, the Rejecting Creditors will not receive or retain under the Plan on account of their claims property of a value, as of the Plan effective date, that is not less than the amount they would so receive or retain in the hypothetical Chapter 7 case.  The Plan therefore does not satisfy § 1129(a)(7)(A)(ii).

---

[27]  Because there has already been an appointment of a Chapter 11 Trustee, a Chapter 7 trustee appointed upon conversion would not have a second period within which to commence avoidance actions.  *See* 11 U.S.C. § 546(a)(1)(B) (establishing an extended limitations period "after the appointment or election of the *first* trustee under section 702, 1104, 1163, 1201, or 1302") (emphasis added).

[28]  The Trustee also asserts that the Plan provides the Restitution Claimants with as much as they would receive under a Chapter 7 liquidation because a Chapter 7 trustee could seek to equitably subordinate the claims of the rejecting Restitution Claimants to other creditors under § 510(c).  Equitable subordination under § 510(c) "is an extraordinary remedy" that must be employed "sparingly."  *In re Alternate Fuels, Inc.,* 789 F.3d 1139, 1154 (10th Cir. 2015).  It requires, among other things, "'inequitable conduct' on the part of the claimant sought to be subordinated."  *In re Hedged-Investments Associates, Inc.,* 380 F.3d 1292, 1300 (10th Cir. 2004).  Although inequitable conduct includes "'fraud, illegality, and breach of fiduciary duties,'" *Hedged-Investments,* 380 F.2d at 1301 (quoting *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators),* 926 F.2d 1458, 1467 (5th Cir. 1991)), "[a] majority of courts have described the degree of inequitable conduct warranting subordination as 'gross and egregious, tantamount to fraud, misrepresentation, overreaching or spoliation, or involving moral turpitude.'" *Alternate Fuels,* 789 F.3d at 1155 (quoting *In re Eufaula Indus. Auth.,* 266 B.R. 489, 489 (10th Cir. BAP 2001)).  There is no evidence before the Court of any egregious or inequitable conduct on the part of the Rejecting Creditors or any other of the Restitution Claimants that could warrant the subordination of their claims.  Any part of the claims representing profit has already been disallowed.  An unwitting participation in an illegal Ponzi scheme is insufficient to equitably subordinate the Net Loss claim of the innocent non-insider victim. The Trustee's alternative argument is, therefore, unpersuasive.

-25-

III.     Informal Proofs of Claim

Finally, the Committee objected to the Plan's inclusion of the claimants who filed claims in the Douglas F. Vaughan personal bankruptcy instead of the VCR bankruptcy (the "Informal Restitution Claims."). Resolution of this issue is not necessary to the Court's decision to deny confirmation of the plan.

CONCLUSION

The Trustee agrees that the rising tide method cannot be used to distribute funds under a Chapter 11 plan to other classes of unsecured claims to equalize payment of the debtor's original obligations but urges that the very nature of a Ponzi scheme makes it an appropriate method to distribute funds to a class of Ponzi scheme investors. In a bankruptcy case, public policy predicated on the nature of a Ponzi scheme catches up investors who have received a smaller return on their investment through the claims allowance process – claims are disallowed to the extent greater than the difference between the principal balance and all pre-petition amounts received. Further, Ponzi investors often must give back net profits through avoidance action litigation. However, once investor claims and recoveries are partly equalized by these means, unlike receivership law, bankruptcy law does not permit a Chapter 11 trustee to equalize the Ponzi investors return on investment further through a rising tide method of distribution. The Trustee has equalized returns on investment to the extent permitted by the bankruptcy law. The Trustee must now treat the allowed claims that remain the same.

Case 10-10759-j11    Doc 2603    Filed 12/21/15    Entered 12/21/15 14:29:56 Page 26 of 27

Based on the foregoing, the Plan cannot be confirmed. The Plan fails to satisfy the "same treatment" requirement of § 1123(a)(4), incorporated into the § 1129(a)(1) confirmation requirement, and fails to satisfy the best interest of creditors test under § 1129(a)(7). The Court will enter a separate order denying confirmation of the Trustee's plan.

ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: December 21, 2015

COPY via CM/ECF to all counsel of record